**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------X

**STEPHANIE SINCLAIR,**

                    *Plaintiff*,

**v.**

**ZIFF DAVIS, LLC, and**
**MASHABLE, INC.,**

                   *Defendants*.

-----------------------------------------------------------------X

**1:18-CV-00790**
**(DAB)**


**ECF CASE**


**MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFF'S SECOND AMENDED COMPLAINT**

JAMES BARTOLOMEI, ESQ.
Duncan Firm, P.A.
900 S. Shackleford Road, Ste. 725
Little Rock, Arkansas 72211
501-228-7600 phone
646-572-8989 fax
jim@duncanfirm.com

BRYAN D. HOBEN, ESQ.
420 S. Riverside Drive, Ste. 158 Croton on
Hudson, NY 10520 347-855-4008
914-992-7135 fax
bryan@hobenlaw.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES     ii-iv

PRELIMINARY STATEMENT     1-3

I. STATEMENT OF FACTS     3-12

A. The Parties     3-4.

B. Embedding & Display of the Photo by Defendants     4-6

C. Instagram's Labyrinthine of Terms     6-10

D. The Photo and the "Listicle" [Article]     10-12

II. ARGUMENT     12-24

A. STANDARD OF REVIEW     12-15

B. INSTAGRAM DOES NOT PROVIDE AN EXPRESS OR IMPLIED CONTRACT (SUB-LICENSE) TO DEFENDANTS     15-22

1. No clear and valid contract exists between Plaintiff, Instagram and Defendants as Beneficiaries     15-16

a. California Contract Principles     16-17

b. New York Contract Principles     17-19

c. Instagram's User Policies, Agreements and Guidelines     19-22

C. PLAINTIFF SUFFICIENTLY PLEAD A CLAIM FOR RELIEF AGAINST ZIFF DAVIS ACCORDING TO THE LEGAL TERMS OF SERVICE ON MASHABLE.COM     22-24

CONCLUSION     25

Ex. A: Plaintiff Sinclair Affidavit     Attached

# TABLE OF AUTHORITIES

**CASES**

*Goldman v. Breitbart News Network, LLC*, No. 17-CV-3144 (KBF), 2018 WL 911340, at *1 (S.D.N.Y. Feb. 15, 2018)…………………………………………………………………2, 5, 6

*Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)…………………………………………..13

*Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009)…………………………….…………………13

*Cortec Indus., Inc. v Sum Holding L.P.,* 949 F2d 42, 47 (2d Cir 1991)…………………………13

*Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972) (per curiam)……………………………………………………………………………………..13

*Novelty Textile Mills v. Joan Fabrics Corp.*, 559 F.2d 1090, 1092 (2d Cir. 1977)………..13, 14

*Trans World Airlines, Inc. v. Hughes,* 308 F.Supp. 679, S.D.N.Y.1969, supplemented 312 F.Supp. 478……………………………………………………………………………………..14

*U.S. v. Berrojo*, 1980, 628 F.2d 368, C.A.5 (Fla.)……………………………………………14

*Alvary v. U.S*, 302 F.2d 790 (N.Y. 1962)……………………………………………………14

*Wang v. Pataki*, 396 F. Supp. 2d 446, 458 n.2 (S.D.N.Y. 2005)………………………………15

*Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 (2d Cir. 2002)……………15

*Veronica Foods Co. v. Ecklin*, No. 16-CV- 07223-JCS, 2017 WL 2806706, at 4 (N.D. Cal. June 29, 2017…………………………………………………………………………………………..15

*International Klafter Co. v. Continental Casualty Co.,* 869 F.2d 96, 100 (2d Cir.1989)………..15

*United States Naval Inst. v. Charter Communications, Inc.,* 875 F.2d 1044, 1048 (2d Cir.1989)……………………………………………………………………………………16

*Proteus Books, Ltd. v. Cherry Lane Music Co.,* 873 F.2d 502, 509–10 (2d Cir.1989)………….16

*Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821–22 (9th Cir. 1985)……….16

*Spinks v. Equity Residential Briarwood Apartments,* 171 Cal. App. 4th 1004, 1023 (2009)…16

*Autodesk, Inc. v. Alter*, No. 16-CV-04722-WHO, 2018 WL 1335858, at *3 (N.D. Cal. Mar. 15,

2018)……………………………………………………………………………..16-17

*Trs. of Screen Actors Guild—Producers Pension & Health Plans v. NYCA, Inc.,* 572 F.3d 771, 779 (9th Cir.2009)…………………………………………………………………17

*Stern v. Does*, 978 F. Supp. 2d 1031, 1039 (C.D. Cal. 2011), *aff'd sub nom. Stern v. Weinstein*, 512 F. App'x 701 (9th Cir. 2013)………………………………………………………..17

*County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 63 (2d Cir.1984)…………………17

*Synovus Bank of Tampa Bay v. Valley Nat'l Bank,* 487 F.Supp.2d 360, 368 (S.D.N.Y.2007)…..17

*LaSalle Nat'l Bank v. Ernst & Young LLP,* 285 A.D.2d 101, 729 N.Y.S.2d 671, 676 (1st Dep't 2001)……………………………………………………………………………17

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F Supp 712, 733 [SDNY 1989]………17-18.

*Port Chester Elec. Constr. Corp. v. Atlas,* 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983, 985–86 (1976)……………………………………………………………………………..17-18

*Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 464 N.Y.S.2d 712, 451 N.E.2d 459, 469 (1983)………………………………………………………………………18

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1335 (Fed. Cir. 2012)…………………………………………………………………………………18

*Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 173 (S.D.N.Y. 2009)………………………………………………………………………………18

*Labor Law 240 Risk Management LLC v. CRC Insurance Services, Inc.* 2018 NY Slip Op. 30859(U)…………………………  ……………………………….………………………18

*Startech, Inc. v VSA Arts*, 126 F Supp 2d 234, 236 [SDNY 2000]……………………….18-19

*Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 121 (S.D.N.Y. 2015)………………….19

*Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 557 (1985)…………..19

*Lasica v. America Online, Inc.*; *Ariel (UK) Ltd. v. Reuters Grp. PLC*………………………..19

*BWP Media USA Inc. v. Hollywood Fan Sites LLC*, No. 14-CV-121, 2015 WL 3971750 (S.D.N.Y. June 30, 2015)…………………………………………………………………24

**STATUTES**

Berne Convention Implementation Act. Pub. L. No. 100-568, 102 Stat. 2853 (1988)………….12

Fed. Civ. Rule 12(b)(6)………………………………………………………………..13

Fed. Civ. Rule 56……………………………………………………………………13

Fed. R. Evid. 201……………………………………………………………………14

Section 512(c) of the Digital Millennium Copyright Act ("DMCA")…………………………24

**SECONDARY SOURCES**

"Growing Up Digital" report by UK's Office of the Children's Commissioner for England, * 8, published 1/4/2017: https://www.bl.uk/collection-items/growing-up-digital-a-report-of-the-growing-up-digital-taskforce……………………………………………………………….2

US Senate Testimony Joint Commerce and Judiciary Committee, 4:36:00-4:37:20 April 6, 2018: https://www.judiciary.senate.gov/meetings/facebook-social-media-privacy-and-the-use-and-abuse-of-data at 4:36:00-4:37:20………………………………………………………….2

https://youtu.be/bBevsgSn65A "Your user agreement sucks."……………………………………2

https://www.copyright.gov/dmca-directory/faq.html …………………………………………24

## PRELIMINARY STATEMENT

Plaintiff Stephanie Sinclair earns a living as a Pulitzer Prize winning photographer. She filed suit seeking a remedy to the issue: Can a media company such Mashable – which Plaintiff denied permission to license her copyrighted photo to – avoid copyright infringement liability by using third party Instagram to cause her photo to be displayed, even *after* being denied a license? Instagram's public position is that you [the creator] own your photos and Instagram cannot sell your photos for advertising. Plaintiff rhetorically asks: Why should Mashable and Ziff Davis be any different? Instagram's Platform Policy makes it clear: "Comply with any requirements or restrictions imposed on usage of Instagram user photos and videos by their respective owners. You are solely responsible for making use of User Content in compliance with owners' requirements or restrictions." See Paragraph 11 of Instagram API,[1] SAC Ex. E.

Plaintiff filed her second amended complaint ("SAC") for willful copyright infringement against Defendants Ziff Davis, LLC ("Ziff Davis") and Mashable, Inc. ("Mashable") because Defendant Mashable sought, and Plaintiff declined, to license Plaintiff's copyrighted photo to Mashable, only for Plaintiff to later discover that Defendants brazenly published Plaintiff's photo after being a denied a license. See generally SAC.

Rather than answer, Defendants filed a Motion to Dismiss (the "Motion"), asserting that Mashable holds a sub-license to Plaintiff's photo with third party Instagram as a third party beneficiary to Plaintiff's contract with Instagram. Defendants intentionally failed to mention in the Motion that they were denied a license. Buried in the Motion's preliminary statement is a two page footnote [1] about how the Courts are not in harmony as to what the definition of "causing a photo to be displayed" under the Copyright Act, and how this Court's recent ruling was wrong:

---

[1] Available at: https://www.instagram.com/about/legal/terms/api/; attached as Ex. "E" to SAC.

"In this copyright infringement case… ...the Court must construe how images shown on one website but stored on another website's server implicate an owner's exclusive display right… … this Court concludes.. ...that when defendants caused the embedded Tweets to appear on their websites, their actions violated plaintiff's exclusive display right; the fact that the image was hosted on a server owned and operated by an unrelated third party (Twitter) does not shield them from this result."

*Goldman v. Breitbart News Network, LLC*, No. 17-CV-3144 (KBF), 2018 WL 911340, at *1 (S.D.N.Y. Feb. 15, 2018).

Defendants' Motion applies a misguided, incomplete factual analysis, sidestepping the *Goldman* holding, and instead framing the facts of this case under one that lives and dies on whether Mashable has a license (or not.). Rather, this case is really about whether Mashable violated the Instagram user terms of service, ignored Instagram's public admission and proclamation that "it is not our [Instagram's] intention to sell your photos,"[2] ignored that Plaintiff rejected Mashable's written request to license her photo, and proceeded anyway to cause the photo to be displayed by using Instagram in an attempt to avoid liability and/or paying her customary licensing fees. Further, Mashable seeks to have the Court take judicial notice of Instagram's various spider web of tangled "user agreements," which, at seven pages and 5,000 words long, resulted in one British government study finding that  the "language and sentence structure only a postgraduate could be expected to understand."[3] Even Instagram admits "[their] legal documents are easy to misinterpret."[4] A U.S. Senator recently quipped to the CEO of Instagram's parent company, Facebook, during testimony before the Senate in April 2018[5],

---

[2] http://instagram.tumblr.com/post/38252135408/thank-you-and-were-listening
[3] "Growing Up Digital" report by UK's Office of the Children's Commissioner for England, * 8, published 1/4/2017: https://www.bl.uk/collection-items/growing-up-digital-a-report-of-the-growing-up-digital-taskforce
[4] http://instagram.tumblr.com/post/38252135408/thank-you-and-were-listening
[5] US Senate Testimony Joint Commerce and Judiciary Committee, 4:36:00-4:37:20 April 6, 2018: https://www.judiciary.senate.gov/meetings/facebook-social-media-privacy-and-the-use-and-abuse-of-data at 4:36:00-4:37:20. (Also via Youtube at: https://youtu.be/bBevsgSn65A.)

"your user agreement sucks."[6]

Finally, Ziff Davis seeks dismissal asserting that it is not proper a party to this action.

If the Motion is granted, a ruling denying Plaintiff a remedy would solidify the chilling effect for all photographers who publish their original photos on Instagram, and gift big media companies a windfall in the form of original, valuable content without paying for it. Companies like Mashable would continue to use those photos in their articles and advertising-based content, and avoid paying licensing fees to photographers. Accordingly, the Motion must be denied.

## I.   STATEMENT OF FACTS

### A.  The Parties

Plaintiff Sinclair is an award-winning independent photojournalist who sustains her livelihood by regularly licensing her copyrighted photos to news reporting and issue advocacy campaigns.[7] SAC ¶ 9-15. She is best known for *Too Young to Wed*, her 15-year project on child marriage, from which she has licensed images to organizations such as the United Nations and US State Department, and news outlets like *National Geographic* and *New York Times*. Id.

In 2014, Plaintiff made her *Too Young to Wed* project into a nonprofit organization focusing on educating policymakers and the public about child marriage.  Id. Plaintiff has impacted the lives of countless females, and donates much of her time to *Too Young to Wed*, drawing no salary and instead relying on her photo licensing to earn a living. Id.

To sell licenses, Plaintiff owns a public website to showcase her photos and invite offers from potential licensors. Id. Similar to her colleagues, Plaintiff maintains a public Instagram

---

[6] Facebook bought Instagram in 2012. Discovery would show via Rule 30(b)(6) deposition of Instagram why the agreements are difficult to comprehend and contradictory for average user.
[7] Plaintiff is a recipient of: Pulitzer Prize, UNICEF Photo of Year Award; 3 Visas D'Or; 3 World Press Photo awards; International Center for Photography Infinity Award; Anja Niedringhaus Courage in Photojournalism Award.

account to promote licensing her photos. Id. As a freelance visual journalist like most photographers in her industry, Plaintiff bears the burden of generating income through licensing her photos to support her family. Sinclair Aff. ¶ 4.  Were it to become the norm, Plaintiff maintains that the unlicensed use of photos by digital media organizations such as Mashable seeking to avoid a reasonable licensing fee to creators like Plaintiff destroy the market in which Plaintiff licenses her photos. Id. ¶ 16-17. Plaintiff similarly maintains that if she were to set her publicly-viewable Instagram account to private in order to prevent usages such as Defendants', this would result in loss of a cost effective marketing tool and likely loss of licensing revenue. Id.

Ziff Davis LLC is a digital media and advertising company in the business of producing and distributing content and selling advertising space, marketing, data, and licensing services on its own ad network, across their online and print brands.[8] SAC ¶ 16, 20. Mashable is among Ziff Davis' owned and controlled media properties, an entertainment website garnering 1.5 million daily page views.[9] Id.¶ 17, 20. Mashable generates much of its significant revenue by charging a fee to sell ad space within the content it publishes on www.mashable.com. Id. ¶ 21.

### B. Embedding & Display of the Photo by Defendants

Defendants survey other third party platforms' "embedding" practices such as YouTube, Tumblr, Twitter, Vimeo, and Facebook as way of suggesting, without a supporting affidavit or evidentiary proof, that it is industry-wide practice by media entities that other platforms encourage displaying third party's copyrighted content by "embedding" that content from the platform as a means to avoid paying for licensing fees. Defendants also imply that it is acceptable conduct in the photo-sharing media world to use embedding and, "everyone is doing

---

[8] Ziff Davis' website states that it publishes content in 25 languages across 114 countries, owns media properties including PCMag, IGN, AskMen, Offers.com, Speedtest, Techbargains, Mashable, etc., and operates its own advertising network, NetShelter.
[9] See analytic aggregator, Website Informer: http://website.informer.com/mashable.com.

it; it must be legal." Motion at 3-5. Defendants side step the straightforward facts that are consistent with the recent *Goldman* holding: embedding Plaintiff's photo using Instagram's embed code causes the photo to be displayed on Mashable's website; a public user would believe Mashable published the image on its site without considering the image's location. Id. at ¶ 40.

This case is not about embedding via YouTube, Tumblr, Google, or Twitter; it is about Instagram, which made it clear in a public corporate statement that: Its legal documents are easy to misinterpret; It is not Instagram's intention to sell your photos; Language proposed [in privacy policy and terms of service] also raised question about whether users' photos can be part of an advertisement; Instagram does not have plans for anything like this and because of that it was going to remove the language that raised the question; Instagram users own their content, and Instagram does not claim any ownership rights over your photos.[10]  Further, Mashable also published a listicle (article) in 2012 about how numerous celebrities were outraged by the idea that Instagram could sell their photos: "Instagram's new Terms of Service, which kick in on Jan. 16, would allow the photo-sharing app to sell your images to advertisers without compensation to users. That fact is causing a fair bit of controversy."[11]

Plaintiff plead facts that embedding has the same effect as causing her photo to be displayed on Mashable's website.  Id. Defendants present an obfuscated argument tying privacy settings (who sees the photos on Plaintiff's Instagram account) to the assertion that "public" display gives them a "sublicense" to sell Plaintiff's photo on Defendants' advertising platform.

While Plaintiff does not allege that Defendants stored or saved a copy of Plaintiff's photo to their servers, she does allege that they caused her photo to be viewed on their website through a technical process known as "embedding." Web pages appearing on the internet are typically

---

[10] http://instagram.tumblr.com/post/38252135408/thank-you-and-were-listening
[11] https://mashable.com/2012/12/18/celebrity-outrage-instagram-terms-of-service/#OaQXS1QRFiqZ

constructed by special language known as "HTML" code. This code is as a series of alphanumeric instructions sent from one computer (the one hosting a given website) to another computer (the end user) which interprets the code and displays the webpage on the end user's browser chosen. As recently observed in *Goldman*, it is critical that "HTML code could instruct the browser either to retrieve the photograph from the webpage's own server or to retrieve it from a third-party server" *Goldman v Breitbart News Network, LLC*, 2018 WL 911340.

Similar to *Goldman*, Defendants probably did not download Plaintiff's photo on their servers, and upload that copy on www.mashable.com. Instead, Defendants embedded Plaintiff's photo to their article[12] by incorporating embed code attached to Plaintiff's personal Instagram post displaying the Photo. As a result, Defendants included Plaintiff's Photo with every display of their article on every computer that requested to view it, "without the user having to click on a hyperlink, or a thumbnail, in order to view the Photo." Id.

### C. Instagram's Labyrinthine of Terms.

The Motion focuses on Defendants' strained interpretation of Instagram's exceedingly complex user agreements and policies. To comprehend a user's rights on one of the world's most popular photo sharing platforms, the trier of fact must comprehend all seven (7) pages and 5,000 words in conjunction, with no one clause having priority over another, and some in clear conflict with others. But in doing so, a refrain emerges: Instagram walks a fine line between wanting to make as much unique content available while simultaneously declaring its commitment to preserving and respecting the content creator's intellectual property rights. In stark opposition to Defendants' interpretation, Instagram stresses the importance of respecting and protecting creators' rights in her own images. Plaintiff now attempts to highlight what the four (4)

---

[12] https://mashable.com/2016/03/19/female-photojournalists-social-justice/#o2DmHiDN9gqr

agreements actually say as opposed to what Defendants would like them to say.

<u>Instagram Terms of Use (effective January 19, 2013 through April 19, 2018)</u>

By using the Instagram mobile app, Instagram website, or other Instagram service (together referred to as the "Service"), users agree to be bound by Instagram's Terms of Use ("TOU") *See* Preamble to the Terms of Use.

In the first section of the TOU, titled "Basic Terms," users agree not to post to the Service photos that depict "...infringing… photos or other content." Basic Terms at ¶ 2. Users agree to be "solely responsible for [their] content and any data …photos...works of authorship… that [they] submit, post, or display on the Service." Id. at ¶ 8. Users further accept responsibility for "any activity that occurs through [their] account," (Id. at ¶ 3) before then agreeing not to use the Service for "any illegal or unauthorized purpose," and to "comply with all [applicable] laws, rules and regulations … including but not limited to, copyright laws." (Id. at ¶ 7).

In the "Rights" portion of the Instagram's TOU, users "grant to Instagram [not a third party as Defendants suggest] a non-exclusive, fully paid and royalty-free, transferable, sub-licensable, worldwide license to use the Content that you post on or through the Service," Rights ¶ 3. Users also warrant that they "own the Content posted by [them] on or through the Service," that "posting and use of [their] Content on or through the Service does not violate, misappropriate or infringe on the rights of any third party, including, without limitation … copyrights," and that they "agree to pay for all royalties, fees, and any other monies owed by reason of Content [they] post on or through the Service. Id. at ¶ 4.

Instagram again declares its goal of protecting the rights of its users in their photos in the TOU section titled, "Reporting Copyright and Other IP Violations." Users are warned that "[Instagram] respect[s] other people's rights, and expect you to do the same," and are assured

that Instagram has provided image owners a mechanism to report violations of this right:

"[Instagram] provide[s] you with tools to help you protect your intellectual property rights. To learn more about how to report claims of intellectual property infringement, visit [Instagram's IP information page]". Reporting Copyright and Other IP Violations at ¶¶ 1,2.  Accordingly, Instagram deals harshly with serial IP offenders: "If you repeatedly infringe other people's intellectual property rights, we will disable your account when appropriate." Id at ¶ 3.

Instagram Privacy Policy

The preamble to Instagram's Privacy Policy includes the following language:

By using our Service you understand and agree that we are providing a platform for you to post content, including photos, comments and other materials ("User Content"), to the Service and to share User Content publicly. This means that other Users may search for, see, use, or share any of your User Content that you make publicly available through the Service...

Section 3 of the Privacy Policy titled, "Sharing of Your Information," has a subheading titled, "Parties with whom you may choose to share your User Content" with the clauses:

- Any information or content that you voluntarily disclose for posting to the Service, such as User Content, becomes available to the public, as controlled by any applicable privacy settings that you set. To change your privacy settings on the Service, please change your profile setting. Once you have shared User Content or made it public, that User Content may be re-shared by others.

- Subject to your profile and privacy settings, any User Content that you make public is searchable by other Users and subject to use under our Instagram API.
  Nowhere does Instagram's policies does it state in plain language that a user like

Defendants are given a license to sell another user's content, such as Plaintiff's, and "re-share" that content on their advertisement-driven website to revenue from display of Plaintiff's photo.

Instagram API Platform Policy

Instagram's API Platform Policy (i.e. the API terms of service) makes clear that the platform's primary functions is to "help brands and advertisers … obtain digital rights." API Platform Policy. The preamble concludes by addressing entities such as Defendants: "Finally, we

8

provide the Instagram Platform to help broadcasters and publishers discover content, get digital

rights to media, and share media using web embeds." Id.  Nowhere in the policy is "get digital

rights to media" defined as sharing equals a license to sell another's copyrighted photo.

Paragraph 6 of the API Platform Policy's "General Terms" section compels API users,

such as Defendants, to "follow any instructions we include in our technical documentation." Id.

The phrase "technical documentation" hyperlinks to Instagram's API Developer page where a

distilled iteration of the API Platform Policy is framed in a standalone portion of the page, listing

as its number one directive: "Instagram users own their media. It's your responsibility to make

sure that you respect that right." Clicking on the "Embedding" section of the API Developer

page reveals yet another warning to API users that "people own their Instagram content."[13]

Also, the Instagram API Platform Policy's General Terms instruct users to follow

Instagram's Privacy Policy (¶ 10), and to "[c]omply with any requirements or restrictions

imposed on usage of Instagram user photos and videos ("User Content") by their respective

owners. [API users] are solely responsible for making use of User Content in compliance with

owners' requirements or restrictions." Id. at ¶ 11. Instagram also demands that API users, such as

Defendants, "[c]omply with all applicable laws or regulations. Don't provide or promote content

that violates any rights of any person, including but not limited to intellectual property rights,

rights of privacy, or rights of personality. Don't expose Instagram or people who use Instagram

to harm or legal liability," Id at ¶ 36.

Further, the Instagram API Platform Policy "Things You Should Know" section

explicitly states API users' responsibilities toward those whose content the API user would

display via the API. Supra note 13. Paragraph 8, subtitled "Licensed Uses and Restrictions", yet

---

[13] It is common knowledge, maybe by judicial notice, that simply giving a content creator who
has a copyright, credit for her work does not absolve one from copyright infringement.

again signals Instagram's intent to highlight the primacy of content owners' rights over those of

API users when it notes "that User Content is owned by users and <u>not</u> by Instagram," but adds a

qualifier that "[a]ll rights not expressly granted to you are reserved by Instagram," <u>not</u> third

parties. Id.

> Following this, Instagram explains the nature of an Instagram API user's responsibility:

> You represent and warrant that you own or have secured all rights necessary to display,
> distribute and deliver <u>all content in your app or website</u>. To the extent your users are able
> to share content from your app or website on or through Instagram, you represent and
> warrant that you own or have secured all necessary rights for them to do so in accordance
> with Instagram's available functionality. Things You Should Know, ¶ 9.

> **Instagram clearly states that** by agreeing to Instagram's API Platform Policy, API users

like Defendants "represent and warrant" that they "satisfy all licensing, reporting, and payout

obligations to third parties in connection with [their] app or website." <u>Id.</u> ¶ 10.

> <u>Instagram Community Guidelines</u>

> The topic titled "Share only photos and videos that you've taken or have the right to

share" requires Instagram users not to "post anything [they have] copied or collected from the

internet that [they] don't have the right to post." Community Guidelines. Equally important to

paragraph 9 of the API Platform Policy above is paragraph 11 here: "Comply with any

requirements or restrictions imposed on usage of Instagram user photos and videos ("User

Content") by their respective owners. You are solely responsible for making use of User Content

in compliance with owners' requirements or restrictions." <u>Id.</u>

> In this case, the indisputable fact is that Mashable was denied permission for a license by

Plaintiff, but chose to display Plaintiff's photo anyway. SAC ¶ 31.

> **D.  The Photo and the "Listicle" [Article]**

> On March 11, 2016, Mashable, through its employee SaVonne Anderson, contacted

10

Plaintiff via email and sought Plaintiff's permission to license Plaintiff's photo in Mashable.com

article. Exhibit "A" to SAC. Defendants avoid mentioning these facts in the Motion despite

knowledge and notice that they did <u>not</u> have permission to cause the photo to be displayed.

Plaintiff replied to Mashable, asking how much Mashable would pay for a license to which

Mashable offered $50.00 for a license. <u>Id.</u>  Plaintiff generally does not license her photos for a

nominal amount, and did not accept Mashable's license offer.  <u>Id.</u> ¶ 23-25.  Or about March 19,

2016, Mashable, without consent or permission, published Plaintiff's copyrighted photo in the

"listicle" article Mashable.com authored by the same SaVonne Anderson who emailed Plaintiff.

20 months later in December 2017, Plaintiff discovered that Mashable had published Plaintiff's

copyrighted photo in its listicle on Defendant's <u>website</u>. Exhibit "B" to SAC.

Plaintiff does not allege that Defendants stored or saved a copy of Plaintiff's photo to

their own servers; however, Defendants did make Plaintiff's photo available for viewing (cause

to be displayed) on their website through a technical process known as "embedding," as

discussed above.

The "article" in question is what is known as a "listicle." Exhibit "C." to SAC. Listicles

are what reputable journalists describe as "clickbait," known for content presented as a numbered

series of "top 10 list" entries of limited text and/or photos designed to drive user traffic to a

website like Mashable.com, thereby generating advertising revenue regardless of editorial quality

of the content, and regularly spending little to no money to "re-share" others' content. Sinclair

Aff. ¶ 13-14. In this case, Defendants paid nothing for Plaintiffs' photo, but received the benefit

of the photo for its advertising-driven web site.  See generally SAC.

Rather than discuss the complete facts, Mashable does a bait and switch, and paints a

picture that Instagram and Plaintiff authorized Defendants to embed Plaintiff's Instagram Post,

11

suggesting that "public" viewing rights equates to permission to display and generate ad revenue from third party content, while avoiding paying copyright owners such as Plaintiff.  Defendants crow that Plaintiff's textual description of her Instagram Post did not contain a "reservation of rights or copyright notice." Plaintiff had no obligation to do so because Congress eliminated "notice" as a condition for copyright under the Berne Convention Implementation Act. Pub. L. No. 100-568, 102 Stat. 2853 (1988).

Defendants also insist "Plaintiff could have, at any time, caused the embed code in the article to cease … showing Plaintiff's Instagram Post by revoking her election to make that post public or deleting the Instagram Post." Motion at 4-5. Such suggestion mocks a copyright holder's exclusive rights under the Copyright Act and punishes professional photographers by forcing them to remain in "private mode" on one of the most popular public photo sharing platforms in the world. Sinclair Aff. ¶ 16-17. Further, Defendants appear to have violated Instagram's TOU by suggesting that Plaintiff take this mitigation step.[14]

## II.     ARGUMENT

`

The SAC adequately pleads a claim for copyright infringement. In order for Plaintiff's claim to survive, her SAC must plausibly allege sufficient facts to support (a) that Plaintiff owns a valid, existing copyright for the image (which is not disputed), (b) an allegation of infringement by Defendants of that copyright interest.  Plaintiff submits that: 1) there is no contract with a "clear and valid license" with no consideration and 2) Instagram's term "re-share" is unclear, and cannot mean a license to display and sell Plaintiff's photo on Mashable's advertising-supported web site.

### A.  STANDARD OF REVIEW.

---

[14] Under the TOU's "Basic Terms," users must agree "not to attempt to restrict another user from using or enjoying the Service." Basic Terms at ¶ 16.

On a Rule 12(b)(6) motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter" such that the allegations contained "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007). The Court must accept all allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor, *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). A complaint will not be dismissed when allegations supported by sufficient factual contentions "nudge [the] claims across the line from conceivable to plausible." *Twombly,* 559 U.S. at 570.  Rule 12(b)(6) also states that when a motion is made under Rule 12(b)(6) and "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56," giving all parties a reasonable opportunity to present pertinent material under that Rule. See Rule 12(b)(6). *Cortec Indus., Inc. v Sum Holding L.P.*, 949 F2d 42, 47 (2d Cir 1991). Further, this provision of the Rules relating to extraneous material that causes a Rule 12(b)(6) motion to be translated into a Rule 56 motion is now mandatory. See *Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 1234, 31 L.Ed.2d 569 (1972) (per curiam).  Id.

Here, Plaintiff has sufficiently plead the plausibility that Defendants' use of Plaintiff copyrighted photo violated the Copyright Act because Plaintiff denied Mashable permission to license her photo and a factual dispute exists regarding whether there is a clear and valid license contract that Mashable holds via Instagram. *See* SAC ¶¶ 31-42; Sinclair Aff. ¶ 16. Plaintiff established prima facie copyright infringement based on (1) ownership of a valid, existing copyright; and (2) Defendants' unauthorized copying and causing to be displayed of her copyrighted material. See *Novelty Textile Mills v. Joan Fabrics Corp.*, 559 F.2d 1090, 1092 (2d Cir. 1977), SAC generally. Defendants attack the SAC by arguing that a valid, clear meetings-of-

the-minds license contract existed by misapplying and confusing Instagram terms of use, API terms, and privacy policy.

Plaintiff submits her affidavit in support of her opposition whereby she denies her intent for Instagram to authorize third parties, such as Mashable, to "re-share" (license), display and <u>generate revenue</u> on its website using her photo without paying her after being denied a license.

Defendants take great liberty in suggesting that this Court take judicial notice of what is being contested as a fact issue: does a contract exist granting Mashable a license, and can this issue be resolved by judicial notice by simply reading Instagram's complex, spider web site of user agreements, which Plaintiff submits require a post-graduate reading level for the average user to interpret. Plus the user agreements contradict Mashable's position and Instagram's stated intent. Judicial notice is defined as: "The court may judicially notice a fact that is **<u>not</u>** subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  See Fed. R. Evid. 201.

"The more critical an issue is to a case, the more reluctant courts should be to determine it by taking judicial notice." *Trans World Airlines, Inc. v. Hughes,* 308 F.Supp. 679, S.D.N.Y.1969, supplemented 312 F.Supp. 478.  The doctrine of "judicial notice" permits a court "to consider generally accepted or readily verified fact as proved without requiring evidence to establish it." *U.S. v. Berrojo*, 1980, 628 F.2d 368, C.A.5 (Fla.). On disputed fact questions, "courts should not use doctrine of judicial notice to go outside record unless facts are common knowledge or are capable of certain verification." *Alvary v. U.S*, 302 F.2d 790 (N.Y. 1962).

 Defendants misapply why judicial notice is appropriate here. Even the cases whereby judicial notice was taken do not support their position. *Wang v. Pataki*, 396 F. Supp. 2d 446, 458

14

n.2 (S.D.N.Y. 2005)(Noting court can take judicial notice for simple questions such as: does the Village Voice charge for a listing [its site on the internet clearly states no); *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 (2d Cir. 2002)(judicially noticed fact must be one not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.”); *Veronica Foods Co. v. Ecklin,* No. 16-CV- 07223-JCS, 2017 WL 2806706, at 4 (N.D. Cal. June 29, 2017)(judicial notice of simple items as pages from website and social media posts, but declines judicial notice of media reports and third party websites because cannot be “accurately and readily determined from sources whose accuracy cannot reasonably be questioned.”)  Here, Plaintiff submits that judicial notice as to whether a valid contract exists giving Mashable a license vis-a-vis Instagram’s various agreements is wholly inappropriate because there is a “reasonable dispute” as to critical fact issues that require evidence to establish what Instagram intended, what consideration was present and what Plaintiff understood when she used the Instagram service.

### B.  INSTAGRAM DOES NOT PROVIDE AN EXPRESS OR IMPLIED CONTRACT (SUB-LICENSE) TO DEFENDANTS

Defendants cannot establish in the Motion (or even a summary judgment standard) that Plaintiff’s use of the Instagram service gives Defendants a license to display and sell her photo.

### 1.  No clear and valid contract exists between Plaintiff, Instagram and Defendants as Beneficiaries.

Defendants assume that a “clear and valid” license contract exists between Plaintiff and Instagram, and they are third party beneficiaries with the right to display and sell advertising that is tied to displaying Plaintiff’s photo. Motion at 12. Because judicial notice is inappropriate here, Plaintiff maintains that contract analysis is required. Out of an abundance of caution, Plaintiff

engages in an analysis without the benefit of full discovery.

It is a fundamental principle of contract interpretation that, absent ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible. *International Klafter Co. v. Continental Casualty Co.,* 869 F.2d 96, 100 (2d Cir.1989). See also *United States Naval Inst. v. Charter Communications, Inc.,* 875 F.2d 1044, 1048 (2d Cir.1989). When contracts contain integration clauses, extrinsic evidence may not be admitted to prove different or additional terms in the contract, although it may be admitted to interpret ambiguous terms of an integrated contract. *Proteus Books, Ltd. v. Cherry Lane Music Co.,* 873 F.2d 502, 509–10 (2d Cir.1989). In this case, there is no explicit integration clause within the various Instagram agreements (Terms of Use, Privacy, Platform (API), and Community Guidelines) other than references within each page to the other. Plaintiff offers both California and New York contract principles for analysis, followed by an Instagram analysis.

a. California Contract Principles

"A third party qualifies as a beneficiary under a contract if the parties intended to benefit the third party and the terms of the contract make that intent evident." *Karo v. San Diego Symphony Orchestra Ass'n,* 762 F.2d 819, 821–22 (9th Cir. 1985)(citations omitted). A third party must demonstrate "that [it] is a member of a class of persons for whose benefit it was made." *Spinks v. Equity Residential Briarwood Apartments,* 171 Cal. App. 4th 1004, 1023 (2009)(internal quotation marks and citations omitted); *Prouty v. Gores Tech. Gr.,* 121 Cal. App. 4th 1225, 1233 (2004)." *Autodesk, Inc. v. Alter*, No. 16-CV-04722-WHO, 2018 WL 1335858, at *3 (N.D. Cal. Mar. 15, 2018)(Whether the third party is an intended beneficiary involves intention of the parties from reading the contract and circumstances under which it was entered).

Plaintiff objects to Defendants' assumption that the Instagram terms are clear that it is a

16

beneficiary of any alleged contract with Plaintiff. Under California contract law, "a purported third-party beneficiary must show that the contract was 'made expressly for the benefit of a third person' "—as opposed to the case where the third person is merely an "incidental" beneficiary. *Trs. of Screen Actors Guild—Producers Pension & Health Plans v. NYCA, Inc.,* 572 F.3d 771, 779 (9th Cir.2009) (internal quotes omitted). Here, Defendants are, at best, only incidental beneficiaries of the agreement between Plaintiff and Instagram. *Stern v. Does*, 978 F. Supp. 2d 1031, 1039 (C.D. Cal. 2011), *aff'd sub nom. Stern v. Weinstein*, 512 F. App'x 701 (9th Cir. 2013).

### b. New York Contract Principles

In New York, to succeed as a third party beneficiary, a non-party must be the intended beneficiary of the contract, not an incidental beneficiary to whom no duty is owed." *County of Suffolk v. Long Island Lighting Co.,* 728 F.2d 52, 63 (2d Cir.1984). While a third-party beneficiary does not have to be explicitly mentioned in the contract, New York law requires that the parties' intent to benefit a third-party be shown on the face of the contract. *Synovus Bank of Tampa Bay v. Valley Nat'l Bank,* 487 F.Supp.2d 360, 368 (S.D.N.Y.2007); *see also LaSalle Nat'l Bank v. Ernst & Young LLP,* 285 A.D.2d 101, 729 N.Y.S.2d 671, 676 (1st Dep't 2001) (Parties' intent to benefit the third party must be apparent from the face of contract; absent clear language evincing intent, New York courts have demonstrated a reluctance to construe intent)(citations omitted)). "Absent such intent, the third party is merely an incidental beneficiary with no right to enforce the contract." *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F Supp 712, 733 [SDNY 1989]. *Port Chester Elec. Constr. Corp. v. Atlas,* 40 N.Y.2d 652, 389 N.Y.S.2d 327, 357 N.E.2d 983, 985–86 (1976) (Intended beneficiary may enforce a contract, but it bears the burden of proving its status as an intended third-party beneficiary).

17

To prove an intended beneficiary, a party must show (1) existence of a valid contract, (2) that contract was intended for its benefit, and (3) that benefit is sufficiently immediate, rather than incidental, to indicate assumption by the contracting parties of a duty to compensate the intended beneficiary. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 464 N.Y.S.2d 712, 451 N.E.2d 459, 469 (1983). *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1335 (Fed. Cir. 2012).

A third-party is an intended beneficiary only if "'no one other than the third-party can recover if the promisor breaches the contract' or the contract language should otherwise clearly evidence 'an intent to permit enforcement by the third-party,' … '[D]ismissal [or denial of Motion to dismiss] of a third-party-beneficiary claim [or defense] is appropriate ... where the complaint relies on language in the contract or other circumstances that will not support the inference that the parties intended to confer a benefit on the claimant." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F. Supp. 2d 155, 173 (S.D.N.Y. 2009).  Recently, a New York court found that:

> [the third party plaintiff] is not a promisee of [defendant, one of two parties to the agreement], and the [agreement] does not require any performance to be rendered to [the third party].  [The third party] fails to point to any language indicating that [the two parties to the agreement] intended that the [agreement] was for the benefit of [the third party] and that [the two parties to the agreement] assumed a duty to compensate [the third party] if the benefit was lost.

> *Labor Law 240 Risk Management LLC v. CRC Insurance Services, Inc.* 2018 NY Slip Op. 30859(U).

Also, the law is well settled that "in order for a promise to be enforceable as a contract, the promise must be supported by valid consideration." *Startech, Inc. v VSA Arts*, 126 F Supp 2d 234, 236 [SDNY 2000].

In the case at hand, Defendants cite *Spinelli* to support the proposition that "[d]ismissal

[or denying motion to dismiss] of a claim [or defense] for copyright infringement is proper where a contract underlying the suit clearly and unambiguously demonstrates the existence of the defendant's license to exploit the plaintiff's copyrights and where plaintiff has not shown any limitation on that license." *Spinelli v. Nat'l Football League*, 96 F. Supp. 3d 81, 121 (S.D.N.Y. 2015)(internal citations omitted).

In this, there is no contract that references Defendants as a third party beneficiary that is clear and unambiguous and no consideration to be found flowing from Plaintiff to Instagram to Mashable. Further, Plaintiff denied Mashable permission to license and "exploit" her copyrighted photo, which is clear evidence of limitations on the photo, as cited in the *Spinelli* case for defeating a copyright claim. See SAC ¶ 12. The Copyright Act provides an owner the exclusive right to control and authorize the reproduction and distribution of copies of her copyrighted work under 17 U.S.C. § 106, giving her incentive to create and the ability to profit from her work. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 557 (1985).

Defendants also cite cases *Lasica v. America Online, Inc.*; *Ariel (UK) Ltd. v. Reuters Grp. PLC*, to suggest that a copyright infringement claim is not appropriate given the rights they were granted in the Instagram "contract." However, it is illogical for a breach of contract claim to be made if no valid and clear contract existed to be breached. Motion at 12. Even if Plaintiff had a valid contract with Instagram, the following "contract" analysis defeats the Motion.

c. Instagram's User Policies

Plaintiff does not dispute the existence of the existence of the Instagram policies or that she may be bound by those policies. Sinclair Aff. ¶ 16-17. What she disputes is that the policies are contradictory as to rights flowing from Defendants to Plaintiff and vice versa, that Defendants violated those policies, and that Defendants cannot rely on a group of circular,

19

incomprehensible "integrated" contracts to avoid willful copyright infringement after being

denied a license.

Instagram inundates its users with language conveying Instagram's position that users

must seek and obtain other users' permission in order to post, re-post, or display original images

or videos. See *supra* p. 6-11. Yet, Defendants argue otherwise. Nowhere is this misapplication

more apparent than two places where Defendants attempt to "interpret" Instagram's

ownership/license policy. At both pages 7-8 and 13 of the Motion, Defendants nearly identically

conflate disparate portions of Instagram's policies, grossly distorting the service's policies. For

example, at 7-8 of the Motion, Defendants wrote:

> "The user maintains her copyright ownership in her photos and videos; Instagram obtains
> a non-exclusive, transferable, sub-licensable license from the users to use her content;
> and Instagram conveys a sublicense to third parties who share public content (as
> controlled by the user's privacy settings), using tools provided by Instagram, including
> embed code."

However, this is a misleading and contradictory amalgam. The first part of Defendant's

sentence tracks reasonably well with paragraph 1 of the "Rights" portion of Instagram's TOU

("...you hereby grant to Instagram a non-exclusive, fully paid and royalty-free, transferable, sub-

licensable, worldwide license to use the Content that you post on or through the Service…"); but

the second portion of the sentence does <u>not</u> appear anywhere in Instagram's policy documents as

stated. When Defendants write, "...and Instagram conveys a sublicense to third parties who share

public content (as controlled by the user's privacy settings), using tools provided by Instagram,

including embed code...", they are synthesizing a number of terms from the policy documents to

mislead the court as though Instagram has nakedly given a license to third parties to display and

sell any user's content (provided that content is not uploaded to a user's account marked private)

provided they are using Instagram's technology. This is a blatantly misleading argument. The

20

only place the concept of "sharing" is discussed is on Instagram's Privacy Policy page under

Section 3: Sharing of Your Information. There, within the context of what information is

viewable to a public audience, Instagram states that:

> Any information or content that you voluntarily disclose for posting to the Service,
> such as User Content, becomes available to the public, as controlled by any
> applicable privacy settings that you set. To change your privacy settings on the
> Service, please change your profile setting. Once you have shared User Content or
> made it public, that User Content may be re-shared by others.

The above contains absolutely no affirmative language regarding either a license or the

authority to sell another user's content. Nor does any licensing language appear in any of the

three privacy sections noted by Instagram in section 1 in the "Rights" portion of its TOU.

Section 3 of the Data Policy does refer to Instagram's API, however, but only in the context of

whether a user's post is publicly <u>searchable</u>: "Subject to your profile and privacy settings, any

User Content that you make public is searchable by other Users and subject to use under our

Instagram API."

Defendants' entire "license" defense rests on its reliance on Plaintiff granting "to

Instagram a non-exclusive, fully paid and royalty-free, transferable, sub-licensable, worldwide

license to use the Content that [she] post[s]." TOU, Rights ¶ 1. However, Defendants provide a

paraphrased self-serving interpretation of Instagram's policies that conflates this portion of the

TOU with portions of the Privacy Policy, and the API Platform Policy. *See* Motion at 7-8, 13.

Drawing such a conclusion from decontextualized and disparate portions of Instagram's policies

without using those policies' complete, actual language, makes for a misapplication of all

Instagram user's rights. As a result, Defendants request the Court to rule that the Privacy Policy

(who sees the photo) is the factual link that authorizes "re-sharing" of the photo through the API

embedding, and this in turn grants Defendants a license to sell Plaintiff's photo (as their content)

for profit on their advertising-supported web site without having to pay Plaintiff a licensing fee.

Notably, Defendants avoid mentioning being denied permission to licence the Photo,

SAC ¶¶ 22-26, and ignore the plain language of Instagram API Platform Policies:

General Terms 11. Comply with any requirements or restrictions imposed on usage of Instagram user photos and videos ("User Content") by their respective owners. You are solely responsible for making use of User Content in compliance with owners' requirements or restrictions;

General Terms 16. Don't use the Instagram API to simply display User Content, import or backup content, or manage Instagram relationships, without our prior permission;

General Terms 36. Comply with all applicable laws or regulations. Don't violate any rights of any person, including but not limited to intellectual property rights, rights of privacy, or rights of personality. Don't expose Instagram or people who use Instagram to harm or legal liability.

Things You Should Know 8. Licensed Uses and Restrictions: The Instagram Platform is owned by Instagram and is licensed to you on a worldwide (except as limited below), non-exclusive, non-sublicenseable basis in accordance with these terms. Your license to the Instagram Platform continues until it is terminated by either party. Please note that User Content is owned by users and not by Instagram. All rights not expressly granted to you are reserved by Instagram.

Things You Should Know 9. You represent and warrant that you own or have secured all rights necessary to display, distribute and deliver all content in your app or website. To the extent your users are able to share content from your app or website on or through Instagram, you represent and warrant that you own or have secured all necessary rights for them to do so in accordance with Instagram's available functionality.

Things You Should Know 10. You represent and warrant that you satisfy all licensing, reporting, and payout obligations to third parties in connection with your app or website.

Given these repeated warnings, Instagram understands that the ability to embed content

on a third party website does not give the third party user a license to do so and sell that content.

Unlike Defendants' claims, Instagram privacy setting, re-sharing rights through an embed

code, and rights generally associated with licensing and selling content do not create a license for

Defendants to defeat a copyright claim.

## C. PLAINTIFF SUFFICIENTLY PLEAD A CLAIM FOR RELIEF AGAINST ZIFF DAVIS ACCORDING TO ITS LEGAL TERMS OF SERVICE ON MASHABLE.COM

While Plaintiff's SAC made allegations about Defendants generally as if they were acting in concert and as one, Plaintiff acknowledges that Ziff Davis may be "separate" legal entity from Mashable.[15] However, Plaintiff is suing both Mashable, Inc. and Ziff Davis as she alleges that Ziff Davis maintains control over Mashable, Inc. and holds itself out as Mashable's agent for copyright issues. These facts must be treated as true at the motion to dismiss stage.

Defendants cite *Dauman v. Hallmark Card, Inc.* for the proposition that a parent company is only liable if there is a substantial continuing involvement by the parent specifically with the respect to the alleged infringing activity of the subsidiary. Here, as demonstrated in the facts, Mashable points to Ziff Davis for all copyright claims.[16] Mashable does not have in-house counsel for copyright; George Wukoson from Ziff Davis' legal department represents Mashable in this case for copyright infringement. Further, all legal notices published on mashable.com (consisting of pages for "Privacy Policy," "Terms of Use" and "Cookie Policy") redirect visitors to corresponding legal notices published on www.ZiffDavis.com, which detail visistor's legal relationship not with Mashable, but with Ziff Davis. *See* SAC ¶18. Mashable's "About" section (https://mashable.com/about/) reads "©2005-2018 Mashable, Inc. Mashable is among the federally registered trademarks of Ziff Davis, LLC and may not be used by third parties without explicit permission."

Defendants' maintain that Mashable is a distinct corporation that owns, operates and publishes its own website at the domain name Mashable.com, and by visiting DomainTools, it

---

[15] Plaintiff filed her complaint on January 29, 2018. Ziff Davis' in house counsel communicated that Mashable was the real party to sue, yet failed raise this, prompting Plaintiff to file a first amended complaint. Ziff Davis then raised issues related to the first amended complaint because it believed the FAC failed to frame the facts of the embedding issue accurately.

[16] Mashable maintains no separate Copyright agent at Mashable.com, but instead directs copyright holders seeking redress for infringements made on www.mashable.com to Ziff Davis' website and Ziff Davis' copyright agent working out of Ziff Davis' corporate offices. SAC ¶ 18.

23

proves that Mashable owns the domain Mashable.com. Motion at 3. However, the whois.com site fails to support the Motion, showing that Mashable.com is actually registered as "private."

Plaintiff made no claims and alleges no facts that would support a theory of indirect or secondary copyright infringement against Ziff Davis or would warrant a piercing of the corporate veil. Plaintiff plead sufficient facts at this stage to prove that Ziff Davis is a proper party to pursue a copyright infringement claim given its operational control over Mashable and stated legal relationship between the website user/visitor and Ziff Davis, not Mashable.

Defendants also dismiss that it is of no consequence that Mashable is publicly registered with the U.S. Copyright Office as a Ziff Davis operative as its designated agent to receive copyright infringement claims pursuant to Section 512(c) of the Digital Millennium Copyright Act ("DMCA"). While Plaintiff has made no DMCA-based copyright claims in its Complaint, Mashable's designated agent information is relevant circumstantial evidence of Ziff Davis' control of Mashable, particularly given the fact that "[r]elated or affiliated service providers that are separate legal entities (e.g., corporate parents and subsidiaries) are considered separate service providers, and each must have its own separate designation."[17] Thus, Mashable's designation of Ziff Davis as its designated copyright agent under a U.S. Copyright Office DMCA protocol is an admission by Ziff Davis that it controls Mashable for copyright infringement, and must remain a party in the case.

---

[17] U.S. Copyright Office, https://www.copyright.gov/dmca-directory/faq.html; see also *BWP Media USA Inc. v. Hollywood Fan Sites LLC*, No. 14-CV-121, 2015 WL 3971750 (S.D.N.Y. June 30, 2015)(statute does not contemplate that service provider entity shielded by safe harbor where entity has no presence in the USCO directory; unreasonable to expect parties attempting to find a provider's DMCA agent designation . . .to have independent knowledge of corporate structure).

24

**CONCLUSION**

Defendants' Motion fails to provide any support in fact or in law to maintain that judicial notice is appropriate to rule on a disputed, critical fact as whether contractual rights exists, that Defendants are third party beneficiaries or parties to a valid license contract with Plaintiff, and that Ziff Davis is legally liable as a party. Plaintiff prays the Court deny the Motion in its entirety and all other relief. Alternatively, should the Court grant some or all of the Motion, Plaintiff seeks leave to amend the SAC.

Dated: June 22, 2018

 /s/James Bartolomei

JAMES BARTOLOMEI, ESQ.
Duncan Firm, P.A.
900 S. Shackleford Road, Ste. 725
Little Rock, Arkansas 72211
501-228-7600 phone
646-572-8989 fax
jim@duncanfirm.com

BRYAN D. HOBEN, ESQ.
420 S. Riverside Drive, Ste. 158 Croton on
Hudson, NY 10520 347-855-4008
914-992-7135 fax
bryan@hobenlaw.com

*Attorneys for Plaintiff*

25

## CERTIFICATE OF SERVICE

I hereby certify that on this 22nd day of June, 2018, a true and correct copy of the foregoing was filed with the Court through the ECF-CM electronic filing system, which will automatically serve electronic notice of the same on the counsel of record and hard copies were delivered to the court under its rule.


/s/ James Bartolomei

James Bartolomei, Esq.

Duncan Firm, P.A.
900 Shackleford Road, Ste. 725
Little Rock, Arkansas 72211
jim@duncanfirm.com